1
2
3
4
5              **IN THE UNITED STATES DISTRICT COURT**

6            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

7
8
CAESAR CASTILLO,                          CASE NO.  1:05-cv-00984 TAG
9
                        Plaintiff,         MEMORANDUM DECISION AND ORDER
10                                          ON PLAINTIFF'S APPEAL FROM
                                            ADMINISTRATIVE DECISION
11       vs.
                                            ORDER REMANDING CASE PURSUANT
12  JO ANNE B. BARNHART                     TO SENTENCE FOUR OF 42 U.S.C. § 405(g)
    Commissioner of Social Security,
13                                          ORDER DIRECTING THE CLERK TO
                        Defendant.          ENTER JUDGMENT IN FAVOR OF
14                                          PLAINTIFF AND AGAINST DEFENDANT

15  _____/

16
17        Plaintiff Caesar Castillo ("claimant") seeks  judicial review of an administrative decision

18  denying his claims for Disability Insurance Benefits under Title II of the Social Security Act ("the

19  Act"), 42 U.S.C. § 401 et seq., and for Supplemental Security Income under Title XVI of the Act, 42

20  U.S.C. § 1381 et seq.  Pending before the Court is claimant's appeal from the administrative decision

21  of the Commissioner of Social Security ("Commissioner").  Claimant filed his complaint on July 22,

22  2005 (Doc. 1), and his opening brief on March 2, 2006.  (Doc. 15).  The Commissioner filed her

23  opposition on May 4, 2006 (Doc. 19).  On June 7, 2006, claimant filed an untimely reply

24  memorandum, captioned as an opposition to defendant's cross-motion for summary judgment,

    though no such cross-motion had been filed.  (Doc. 20).
25
          Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties consented to proceed
26
    before a United States Magistrate Judge.  (Docs. 11 and 14).  By an order dated March 27, 2006, this
27
    action was assigned to the United States Magistrate Judge for all further proceedings.  (Doc. 16).
28

                                              1

**JURISDICTION**

On July 23, 2001, claimant filed applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Act, respectively. (Administrative Record ("AR") 103-05). Claimant's applications were denied initially and on reconsideration (AR 59-62, 64-68), whereupon claimant requested an administrative hearing. (AR 69). After claimant failed to appear at a hearing set for April 7, 2003, Administrative Law Judge ("ALJ") Joanne S. Birge issued a Notice to Show Cause for Failure to Appear, to which claimant did not respond, and after which ALJ Birge dismissed the hearing request. (AR 57-58). The Appeals Council reversed this decision. (AR 97-98). A hearing was then held on March 23, 2004 and, on September 15, 2004, ALJ Birge issued a written determination that claimant was not disabled under the Social Security Act. (AR 18-25, 268-311). Claimant sought Appeals Council review of the adverse determination, which was denied on May 24, 2005 (AR 7-10), leaving the ALJ's decision of September 15, 2004 as the final decision of the Commissioner. On July 22, 2005, within sixty days of the notice of Appeals Council action, claimant timely appealed to the district court pursuant to 42 U.S.C. § 405(g). (Doc. 1).

**STATEMENT OF FACTS**

**1.      Claimant's Testimony**

Claimant was 47 years old at the time of the administrative hearing before ALJ Birge. (AR 272). Claimant testified that he had neither a high school diploma nor a GED, and that he had always held the same job as a construction roofer, a skill which he learned on the job. (AR 273). According to claimant, he stopped working in December 2000 or January 2001 because he could no longer tolerate the pain he experienced. (AR 273-75).

As to his medical condition, claimant testified to three problems: his right knee, his back and his right arm. With respect to his right knee, claimant testified that he had surgery on the knee in 1989, resulting in the placement of four pins or screws, one of which was later removed. (AR 275-76). Current problems with the knee, according to claimant, are that it "collapses at any time," occasionally swells and causes pain when claimant is standing. (AR 277). Claimant's second problem pertains to his right arm. (AR 277). According to claimant, he injured the arm while lifting

1  an old style stove, which had slipped and caused a deep laceration. (AR 277-78). Currently,

2  according to claimant, he will occasionally drop things, like a gallon of milk, when his arm weakens.

3  (AR 278). Claimant's third problem pertains to his back. (AR 278-79). During his testimony,

4  claimant described "[e]lectrical pain, from the bottom of [his] back all the way up [his] back." (AR

5  279). According to claimant, standing and walking are a problem because he does not know when

6  his back is going to "start acting up." (AR 279-80).

7  **2.    Claimant's Medical Records**

8          The earliest medical reports in the administrative record are from Jack E. Wilkinson, M.D.,

9  who treated claimant for a deep laceration of the right forearm on June 11, 2001. (AR 155-61). In a

10  doctor's certificate accompanying a claim for disability benefits, Dr Wilkinson noted that claimant

11  would be able to return to his regular or customary work by December 15, 2001. (AR 157).

12          On September 16, 2001, claimant underwent a consultative orthopedic examination by

13  Jonathan M. Gurdin, M.D. (AR 162-64). Claimant presented to Dr. Gurdin with three chief

14  complaints: right knee pain, low back pain and right forearm pain with diminished manual dexterity.

15  (AR 162). As to claimant's right knee, Dr. Gurdin reported claimant's statement that he injured the

16  knee in a truck accident in 1989, suffering ligament injuries and undergoing surgical repair with

17  definite improvement. (Id.). Claimant reported to Dr. Gurdin that the pain in the knee had worsened

18  over the years, that he suffered daily pain in the joint from walking and standing, daily swelling and

19  occasional sharp pain the causes the knee to give out. (Id.). Claimant stated that he had not seen a

20  physician for his knee problem due to limited money and no insurance coverage. (Id.). As to

21  claimant's low back pain, Dr. Gurdin report claimant's statement that he experienced intermittent

22  pain in the lumbar area which comes on with activity including walking, standing, bending, lifting

23  and twisting. (Id.). As to claimant's right forearm pain, Dr. Gurdin report claimant's statement that

24  he had lacerated the arm while lifting an oven onto the back of a pick-up truck. (Id.). Claimant

25  complained of numbness in the anterior aspect of the forearm, pain in the forearm, difficulty using

26  tools ad difficulty with repetitive or strenuous hand use. (Id.). Upon examination, Dr. Gurdin

27  diagnosed the following: (1) prior ligament injury of the right knee with surgical repair, persistent

28  pain and probable degenerative change, (2) lumbar myofascitis with possible degenerative change

1    and (3) recent laceration of the right forearm with persistent pain and numbness.  (AR 164).  Given

2    these impairments, Dr. Gurdin concluded that claimant would have difficulty walking and standing

3    for more than 1 1/2 to 2 hours at a time and for 4 or 5 hours out of 8 hours.  (Id.).  Dr. Gurdin also

4    noted that repetitive bending or working in a bent position would aggravate claimant's back pain, but

5    that claimant appeared capable of lifting and carrying 25 to 30 pounds occasionally and 15 pounds

6    frequently.  (Id.).  As to claimant's right forearm, Dr. Gurdin concluded that manual dexterity

7    appeared to be intact, but that claimant was slow and cautious with right hand function.  (Id.).

8    After the consultative examination by Dr. Gurdin, claimant began to treat at Family Healthcare

9    Network in May, 2002.  (AR 176).  On May 31, 2002, Raymond Pena, M.D. noted a positive straight

10   leg test to 45 degrees and diagnosed right sciatic pain with radiculopathy.[1]  (AR 173).  Dr. Pena

11   prescribed Vioxx, Tylenol 3 and an injection of Toradol, and ordered diagnostic testing.  (Id.).  A

12   radiological report was issued on June 26, 2002, which showed first-degree spondylolisthesis[2] of L4

13   over L5 and a narrowing of L4/5 disc space.  (AR 169).  The radiological report also addressed

14   claimant's right knee, noting moderately severe degenerative changes with a narrowing of the joint

15   space on the medial compartment, and assessing degenerative arthritis.  (Id.).  In a subsequent multi-

16   impairments questionnaire prepared sometime after an examination on July 16, 2002, Dr. Pena

17   noted, with respect to claimant's lower back pain, that he had a positive straight leg test at 60 to 90

18   degrees.  (AR 188).  His diagnosis was right sciatic pain with right extremity radiculopathy.

19   (AR 188-89).  However, upon examination of claimant about one-half year later, on February 10,

20   2003, Dr. Pena noted "[n]egative straight leg tests to 90 degrees bilaterally."  (AR 200).  He then

21   reported a diagnosis of "chronic back pain."  (Id.).

22          On referral from Dr. Pena, claimant was assessed by neurologist Perminder Bhatia, M.D., and

23   the administrative record contains typewritten attending reports from Dr. Bhatia dated March 31,

24   _____

25          [1]  Radiculopathy is "[i]mpairment of a nerve root, usually causing radiating pain, numbness, tingling or muscle
     weakness that correspond to a specific nerve root."  North American Spine Society, Glossary of Spine Terminology,
26   http://www.spine.org/fsp/glossary.cfm (last visited May 31, 2006).

27          [2]  "Spondylolisthesis is forward slippage of a lumbar (lower back) vertebra on the vertebra below it."
     MedlinePlus, Spondylolisthesis, http://www.nlm.nih.gov/medlineplus/ency/article/001260.htm (last modified May 5,
28   2006) (MedlinePlus is a service of the National Library of Medicine and the National Institutes of Health).

April 16 and April 24, 2003, plus various additional hand-written progress notes. (AR 198-99, 217-21, 223). Within the typewritten reports, a positive straight leg raise test at 35 degrees, left side only, was noted on March 31 (AR 218), and a positive straight leg raise test at 45 degrees, bilateral, was noted on April 24. (AR 220). Both reports also noted restricted movement of the lumbosacral spine upon examination. (AR 218, 220). An EMG was performed on April 16, 2003, which showed electrical evidence of bilateral L5-S1 radiculopathy, right side worse than left. (AR 221). In addition, an MRI was performed on April 17, 2003. (AR 214-15, 221). The impressions from the MRI were (1) multilevel degenerative changes, (2) spinal stenosis, primarily at L4-L5, with some compression of the thecal sac, and (3) degenerative disc disease, primarily at L4-L5 and L5-S1. (Id.) Based upon his examinations and the referenced diagnostic tests, Dr. Bhatia diagnosed claimant as having lumbar degenerative disease with radiculopathy, for which he prescribed Norco, Neurontin and Skelaxin. (AR 218, 220-21). On a multiple-impairments questionnaire dated August 11, 2003, Dr Bhatia stated that claimant could sit, stand and walk for no more than one hour in an 8 hour day, and could lift no more than 5 pounds on an occasional basis. (AR 207-08). However, Dr. Bhatia noted no limitations with grasping objects, manipulating objects or using arms for reaching. (AR 209). Dr. Bhatia completed a second multiple impairment questionnaire on November 29, 2004. (AR 256-63). In this questionnaire, he diagnosed "spinal stenosis lumbar" and stated that claimant could sit for up to one hour in an 8 hour day, could stand/walk for up to one hour in an 8 hour day, and could lift nothing. (AR 258-59).

Finally, on February 23, 2004, a private consultative examination was performed by Bruce E. Thompson, M.D. (AR 227-32). Dr. Thompson diagnosed (1) chronic low back pain with spondylolisthesis, discogenic disease and right sciatica, (2) right hand weakness due to medial nerve injury and peripheral neuropathy and (3) instability of the right knee due to a prior fracture, open reduction and internal fixation. (AR 232). Dr. Thompson concluded that claimant was unable to sustain any gainful employment. (Id.). In a multiple impairments questionnaire also dated February 23, 2004, Dr. Thompson noted that claimant could sit for 4 hours in an 8 hour workday, could stand/walk for 3 hours in an 8 hour workday, could lift up to 10 pounds occasionally and would have marked difficulty grasping objects, among other limitations. (AR 233-40).

## SEQUENTIAL EVALUATION PROCESS

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act also provides that a claimant shall be determined to be under a disability only if his impairments are of such severity that claimant is not only unable to do his previous work but cannot, considering claimant's age, education and work experiences, engage in any other substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining whether a person is disabled. 20 C.F.R. §§ 404.1520, 416.920. Step one determines if he is engaged in substantial gainful activities. If he is, benefits are denied. 20 C.F.R. §§ 404.1520(b), 416.920(b). If he is not, the analysis proceeds to step two, which considers whether claimant has a medically severe impairment or combination of impairments. 20 C.F.R. §§ 404.1520(c), 416.920(c).

If claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step, which compares claimant's impairment with a number of listed impairments acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. § 404 Subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, claimant is conclusively presumed to be disabled. If the impairment is not conclusively presumed to be disabling, the evaluation proceeds to the fourth step, which determines whether the impairment prevents claimant from performing work he has performed in the past. If claimant is able to perform his previous work, he is not disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e). If claimant cannot perform this work, the fifth and final step in the process determines whether he is able to perform other work in the national economy in view of his age, education and work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f). See Bowen v. Yuckert, 482 U.S. 137 (1987).

///

1    The initial burden of proof rests upon a claimant to establish a *prima facie* case of entitlement

2    to disability benefits.  Rhinehart v. Finch, 438 F.2d 920, 921 (9th Cir. 1971).  In terms of the five

3    step sequential evaluation process, the Ninth Circuit has held that "[t]he burden of proof is on the

4    claimant as to steps one to four," while at the same time noting that an ALJ's "*affirmative duty* to

5    assist a claimant to develop the record . . . complicates the allocation of burdens" such that "the ALJ

6    shares the burden at each step."  Tackett v. Apfel, 180 F.3d 1094, 1098 & n.3 (9th Cir. 1999)(italics

7    in original).  The initial burden is met once a claimant establishes that a physical or mental

8    impairment prevents him from engaging in his previous occupation.  The burden then shifts to the

9    Commissioner to show (1) that the claimant can perform other substantial gainful activity and

10   (2) that a "significant number of jobs exist in the national economy" which claimant can perform.

11   Kail v. Heckler, 722 F.2d 1496, 1498 (9th Cir. 1984).

12                                   **STANDARD OF REVIEW**

13   Congress has provided a limited scope of judicial review of a Commissioner's decision.  See,

14   42 U.S.C. § 405(g).  A court must uphold the Commissioner's decision, made through an ALJ, when

15   the determination is not based on legal error and is supported by substantial evidence.  See Ukolov v.

16   Barnhart, 420 F.3d 1002, 1004 (9th Cir. 2005)("'[w]e may set aside a denial of benefits only if it is

17   not supported by substantial evidence or if it is based on legal error'")(quoting Thomas v. Barnhart,

18   278 F.3d 947, 954 (9th Cir. 2002)); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985); Delgado v.

19   Heckler, 722 F.2d 570, 572 (9th Cir. 1983) ("[t]he [Commissioner's] determination that a claimant is

20   not disabled will be upheld if the findings of fact are supported by substantial evidence")(citing

21   42 U.S.C. § 405(g)).  Substantial evidence is more than a mere scintilla, Sorenson v. Weinberger,

22   514 F.2d 1112, 1119 n.10 (9th Cir. 1975), but less than a preponderance.  McAllister v. Sullivan,

23   888 F.2d 599, 601-602 (9th Cir. 1989); Desrosiers v. Secretary of Health and Human Services,

24   846 F.2d 573, 576 (9th Cir. 1988).  Substantial evidence "means such evidence as a reasonable mind

25   might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)

26   (citations omitted).  "[S]uch inferences and conclusions as the [Commissioner] may reasonably draw

27   from the evidence" will also be upheld.  Mark v. Celebrezze, 348 F.2d 289, 293 (9th Cir. 1965).  On

28   review, the court considers the record as a whole, not just the evidence supporting the decision of the

                                                    7

1    Commissioner.  Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (quoting Kornock v. Harris,

2    648 F.2d 525, 526 (9th Cir. 1980)).

3         It is the role of the trier of fact, not this court, to resolve conflicts in evidence.  Richardson,

4    402 U.S. at 400.  If evidence supports more than one rational interpretation, the court must uphold

5    the decision of the ALJ.  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).  Moreover, if there is

6    substantial evidence to support the administrative findings, or if there is conflicting evidence that

7    will support a finding of either disability or nondisability, the finding of the Commissioner is

8    conclusive.  Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Nevertheless, a decision

9    supported by substantial evidence will still be set aside if the proper legal standards were not applied

10   in weighing the evidence and making the decision.  Brawner v. Secretary of Health and Human

11   Services, 839 F.2d 432, 433 (9th Cir. 1988).

12                                    **ALJ'S FINDINGS**

13        **Step One**

14        The ALJ found at step one that claimant "has not engaged in substantial gainful activity since

15   the alleged onset of disability."  (AR 24).

16        **Step Two**

17        At step two, the ALJ found that claimant's degenerative arthritis of the right knee,

18   degenerative disc disease and spondylolisthesis in the lumbar spine, lumbar myofascitis, and

19   laceration of the right forearm were "severe" impairments.  (AR 24).

20        **Step Three**

21        At step three, the ALJ assessed whether claimant's impairments, while severe, were among

22   those acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity.

23   See 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1 (Listing of

24   Impairments).  The ALJ  concluded that claimant's impairments did not meet or equal any of the

25   listed impairments.  (AR 24).

26        **Step Four**

27        At step four, the ALJ concluded that claimant was unable to perform his past relevant work

28   as a roofer.  (AR 24).

**Step Five**

At step five, the ALJ found that claimant had the "sedentary" residual functional capacity to lift 10 pounds frequently or occasionally, stand or walk 4 hours in an 8-hour day, and sit without limitation.  (AR 24).  The ALJ also found that claimant was unable to push or pull with the right lower extremity and could only occasionally perform forceful grasping with his right upper extremity.  (Id.)  Based upon claimant's sedentary residual functional capacity, coupled with his limited education and status as a "younger individual," ALJ Birge determined that a finding of not-disabled was directed under "the Grids," 20 C.F.R. Pt. 404, Subpt. P, App. 2,  Rule 201.25 (at onset) and Rule 201.20 (on and after age 45).  (AR 25).  The ALJ also found that claimant's capacity for sedentary work was not substantially compromised by any nonexertional limitations.  (Id.)  Consequently, ALJ Birge concluded that claimant was not disabled under the Act.  (Id.)

## ISSUES

Claimant's Opening Brief raised the following issues for consideration:

1.  Whether the ALJ improperly discounted the residual functional capacity assessment of treating neurologist Perminder Bhatia, M.D.

2.  Whether the ALJ improperly discounted the opinions of consultative examiner Bruce Thompson, M.D.

3.  Whether the ALJ improperly determined claimant's right-arm related functional limitations.

4.  Whether the ALJ improperly failed to consult a vocational expert regarding the available number of sedentary jobs claimant could perform.

This Court must uphold the Commissioner's determination that claimant is not disabled if the Commissioner applied the proper legal standards and there is substantial evidence in the record as a whole to support the decision.

## DISCUSSION

**1.    Discounted Opinion of Treating Neurologist Perminder Bhatia, M.D.**

Claimant asserts that ALJ Birge improperly discounted the residual functional capacity

1  assessment[3] of his treating neurologist, Perminder Bhatia, M.D.  (Doc. 15, pp. 12-15).  In Multiple

2  Impairments Questionnaires completed on August 11, 2003, and on November 29, 2004, Dr. Bhatia

3  had opined that claimant could sit, stand and walk for no more than one hour.  (AR 207, 258). In the

4  November 29, 2004 questionnaire, Dr. Bahia concluded that claimant could never lift or carry

5  anything.  (AR 258).  Dr. Bahia also determined that claimant had no significant limitations doing

6  repetitive reaching, handling, fingering or lifting, and had a minimal degree of limitation in an 8 hour

7  workday using his upper extremities. (AR 258). He also determined that claimant had the normal use

8  of his fingers and hands for fine manipulations, and the normal use of his arms for reaching,

9  including overhead. (AR 259). Dr. Bhatia also reported that claimant claimant "would not be able to

10  compete in open job market for manual laborer." (AR 262).

11      The courts distinguish among the opinions of three types of physicians:  treating physicians,

12  physicians who examine but do not treat the claimant ("examining physicians") and those who

13  neither examine nor treat the claimant ("nonexamining physicians").  Lester v. Chater, 81 F.3d 821,

14  830 (9th Cir. 1996).  As a general rule, a treating physician's opinion is given special weight because

15  of his or her familiarity with a claimant's physical condition.  Id.; Fair v. Bowen, 885 F.2d 597,

16  604-05 (9th Cir. 1989); see also Smolen v. Chater, 80 F. 3d 1273, 1285 (9th Cir. 1996) ("Because

17  treating physicians are employed to cure and thus have a greater opportunity to know and observe the

18  patient as an individual, their opinions are given greater weight than the opinions of other

19  physicians"); Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, *1 (July 2, 1996) (the

20  opinions of a treating physician ordinarily should be given great weight).

21      Regardless of the weight given to a treating physician's medical opinion, it is not binding on

22  the ALJ with respect to the ultimate determination of disability.  See Batson v. Commissioner of

23  Social Security Administration, 359 F.3d 1190, 1194-95 (9th Cir. 2004) (treating physician had

24  opined that claimant "met or equaled the criteria" for a listed impairment under 20 C.F.R. § 404

25  Subpt. P App. 1, § 105C); Magallanes v. Bowen, 881 F. 2d 747, 751 (9th Cir. 1989)("treating

26  physician's opinion is not, however, necessarily conclusive as to either a physical condition or the

27

28  [3] Residual functional capacity ("RFC") is what a claimant can still do despite existing exertional and nonexertional limitations.  Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

10

1   ultimate issue of disability").

2           Accordingly, although entitled to great weight, a treating physician's opinion is not

3   conclusive and may be rejected by the ALJ under appropriate circumstances.  Where a treating

4   physician's opinion is not contradicted by another physician, it may be rejected by the ALJ only for

5   "clear and convincing" reasons supported by substantial evidence in the record.  Reddick v. Chater,

6   157 F.3d 715, 725 (9th Cir. 1998) (quoting Lester, 81 F.3d at 830).  Where a treating physician's

7   opinion is contradicted by another physician, the ALJ may reject the treating physician's opinion

8   only by providing "'specific and legitimate reasons' supported by substantial evidence in the record

9   for so doing." Id. (quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983).  The same test

10  applies to examining physicians: the ALJ must give clear and convincing reasons for rejecting

11  uncontradicted opinions, or "specific and legitimate reasons supported by substantial evidence in the

12  record" for rejecting those opinions that have been contradicted.  Lester, 81 F.3d at 830-31.

13          Courts within the Ninth Circuit have recognized various reasons deemed sufficient for the

14  ALJ to disregard a treating or examining physician's opinion.  These reasons include: conflicting

15  medical evidence, the absence of regular medical treatment during the alleged period of disability,

16  and the lack of medical support for physicians' reports that are based substantially on the claimant's

17  subjective complaints of pain.  Flaten v. Secretary of Health & Human Svcs., 44 F.3d at 1453,

18  1463-64; Fair, 885 F.2d at 604.  The ALJ may also disregard a physician's opinion which is "brief

19  and conclusionary in form with little in the way of clinical findings to support [its] conclusion."

20  Magallanes, 881 F.2d at 751(quoting Young v. Heckler, 803 F.2d 963, 968 (9th Cir. 1986).  In

21  contrast, vague, broad or generalized reasons are insufficient grounds for the ALJ to reject a treating

22  physician's opinion.  McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989).

23          Here, in rejecting Dr. Bhatia's residual functional capacity assessment as set forth above,

24  ALJ Birge set forth specific reasons for doing so.  Her written determination stated as follows:

25              Weight is given to Dr. Bhatia's examination findings, but limited
                weight to his statements that the claimant could sit, stand, or walk for
26              no more than 1 hour; these restrictions are not supported by his own
                findings, which showed that the claimant had relatively mild
27              radiculopathy and limitation in lumbar functioning.  Dr. Bhatias's
                statements that the claimant must alternate sitting and standing
28              frequently and could not maintain concentration because of pain are

11

1

2

<u>based on the claimant's subjective complaints; it is significant that claimant did not return to Dr. Bhatia for ongoing treatment, after the assessment</u>.  (AR 22)(emphasis added).

3    As evident from the above quote, ALJ Birge identified two specific reasons for discounting

4    Dr. Bhatia's assessment of claimant's residual functional capacity.  The first reason was that

5    Dr. Bhatia's residual functional capacity assessment was inconsistent with his "own findings" of

6    "relatively mild radiculopathy and limitation in lumbar functioning."  (AR 22).   This Court,

7    however, is unable to locate the findings referenced by the ALJ, specifically, findings by Dr. Bhatia

8    of "mild" radiculopathy or lumbar limitations.

9    For example, in reporting the results of a March 31, 2003 examination, Dr. Bhatia noted

10   "restricted movements of the lumbosacral spine" and "[p]ositive [straight leg raising] on the left

11   hand side at 35 degrees."  (AR 218).  There is no indication from these comments that either the

12   radiculopathy or the lumbar limitations were "mild."

13   Likewise, in reporting upon an April 24, 2003 examination of claimant, Dr. Bhatia again

14   noted "restricted lumbar spine movements" and "[p]ositive [straight leg raising] bilaterally at 45

15   degrees."  (AR 220).  Dr. Bhatia further noted in his report that he had explained to claimant "the

16   options of intradiscal decompression therapy, epidural injections, and also possible surgery."  (<u>Id</u>.).

17   Once again, there is no indication from these comments that Dr. Bhatia found claimant's

18   radiculopathy or lumbar limitations to be "mild."  An opposite conclusion might be inferred from the

19   treatment options discussed.

20   Similarly, in reporting the results of an EMG test performed on claimant on April 16, 2003,

21   Dr. Bhatia concluded that claimant "has electrical evidence of clinical diagnosis of bilateral L5-S1

22   radiculopathy right side more worse [sic] than the left side."  (AR 221).  There is no indication of

23   "mild" radiculopathy in this conclusion.

24   Finally, in a Multiple Impairment Questionnaire dated November 29, 2004, Dr. Bhatia noted

25   that he had most recently examined claimant on October 19, 2004, that he had diagnosed "spinal

26   stenosis lumbar," that physical therapy and a TENS unit had been tried to no avail, and that

27   claimant's prognosis was "poor."  (AR 256-63).  Once again, there is no indication from Dr. Bhatia's

28   comments within this Multiple Impairment Questionnaire that he believed claimant's radiculopathy

1    or lumbar limitations to be "mild."

2         The second reason given by the ALJ for discounting the residual functional capacity

3    assessment of Dr. Bhatia was as follows: "Dr. Bhatia's statements that the claimant must alternate

4    sitting and standing frequently and could not maintain concentration because of pain are based on the

5    claimant's subjective complaints; it is significant that the claimant did not return to Dr. Bhatia for

6    ongoing treatment, after the assessment." (AR 22). In this regard, and according to a Multiple

7    Impairment Questionnaire completed on November 29, 2004, claimant *had* been treating with

8    Dr. Bhatia every 3 to 4 months through November 19, 2004. (AR 256). However, the

9    administrative record contains no notes of these visits, other than a single Family Health Care visit

10   by claimant on February 13, 2004. (AR 223).

11        In light of the foregoing, remand for additional administrative proceedings with respect to

12   Dr. Bhatia's medical assessment is appropriate. See Barbato v. Commissioner of Social Security,

13   923 F. Supp. 1273, 1277-78 (C.D. Cal. 1996)(remand for additional administrative proceedings was

14   proper where adverse decision of ALJ failed to provide sufficient justification for disregarding

15   treating physician's opinion); cf. Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003)(when there

16   are "insufficient findings" as to whether testimony should be credited as true, court may remand to

17   the Commissioner for "further determinations"). The Court notes that the Commissioner herself has

18   suggested remand in her brief on appeal, absent an affirmance of the ALJ's decision. (See Doc. 19,

19   p. 11 at n.6).

20   **2.      Discounted Opinion of Bruce Thompson, M.D.**

21        Claimant also asserts on appeal that ALJ Birge improperly discounted the opinions of his

22   own consultative examiner, Bruce Thompson, M.D. (Doc. 15, pp. 15-17). Dr. Thompson had

23   opined that claimant could lift and carry no more than 10 pounds occasionally, could stand/walk for

24   3 hours in an 8-hour workday, could sit for 4 hours in a workday and was unable to sustain any

25   gainful employment. (AR 232, 235-36).

26        In minimizing the weight given to Dr. Thompson's assessment, ALJ Birge again set forth

27   specific reasons for doing so. Her written determination stated as follows:

28   ///

13

Some weight is given to Dr. Thompson's assessment of the claimant's functional capacity; however, it is based on a single examination and reflects an uncritical acceptance of the claimant's allegations. Dr. Thompson stated that claimant had extreme limitations since 1997, but did not himself examine the claimant until February 2004. In fact, the claimant's earnings history shows very substantial earnings in 1997, 1998, 1999, and 2000, which would indicate, for a roofer, few impairment-related conditions. (Exhibit 4D, p. 2). Further, the claimant injured his right arm in June 2001, not 2000, and did not fracture it (Exhibit 1F). In March 2003 the claimant did not allege any right hand or arm limitations to Dr. Bhatia, and none were observed. Consequently, the claimant's allegations in February 2004 of right hand limitations, and Dr. Thompson's findings of substantial restriction, are equally non-credible. (AR 22).

In this instance, ALJ Birge did cite specific and legitimate reasons, supported by substantial evidence in the record, for discounting Dr. Thompson's opinions. Primary among these was that Dr. Thompson's report reflected "an uncritical acceptance of the claimant's allegations." (AR 22). These subjective allegations, according to other findings of the ALJ, simply were not credible. Indeed, ALJ Birge explicitly observed that "claimant clearly exaggerated the onset and degree of his injuries to Dr. Thompson." (AR 23). Given that the ALJ's conclusion with respect to claimant's suspect credibility has not been challenged by claimant on appeal, it constituted a specific, legitimate reason for rejecting Dr. Thompson's opinion. See Fair, 885 F.2d at 605 ("the ALJ . . . disregarded [a doctor's] opinion because it was premised on [claimant's] own subjective complaints, which the ALJ had already properly discounted. This constitutes a specific, legitimate reason for rejecting the opinion of a treating physician"). The Court therefore finds no error in this regard.

## 3.     Claimant's Right-Arm Related Functional Limitations

Claimant disputes ALJ Birge's finding that he could occasionally grasp objects with his right hand, maintaining that this finding was unsupported by substantial evidence. (Doc. 15, pp. 17-21). According to claimant, examining physician Bruce Thompson, M.D. had opined that claimant could perform no grasping at all, while a non-examining state agency physician had concluded that claimant must "avoid forceful, repetitive grasping." (Doc. 15 pp. 17-19). The Court disagrees.

As noted in the Standard of Review, supra, a court must uphold an ALJ's determination that is not based on legal error and is supported by substantial evidence. See Ukolov, 420 F.3d at 1004 (9th Cir. 2005)("'[w]e may set aside a denial of benefits only if it is not supported by substantial

14

1   evidence or if it is based on legal error'")(quoting <u>Thomas v. Barnhart</u>, 278 F.3d at 954).  Here, as

2   previously discussed, ALJ Birge properly discounted the opinions of Dr. Thompson, which would

3   include his conclusion that claimant could perform no grasping whatsoever with the right hand.

4   (AR 22).  In contrast, the ALJ gave substantial weight to the opinions of examining physician

5   Jonathan M. Gurdin, M.D., and to a state agency medical consultant.  (AR 22).  Neither of these

6   physicians deemed claimant to be precluded from all grasping activities.  Indeed, Dr. Gurdin

7   specified certain sitting, standing and bending restrictions, but listed no restrictions whatsoever with

8   respect to claimant's right hand.  (AR 164).  Dr. Gurdin noted only that claimant's [m]anual

9   dexterity appeared to be intact in the right hand but he was slow and cautious with right hand

10  function."  (<u>Id</u>.)  Likewise, the reviewing state agency examiner opined that claimant should "avoid

11  forceful, <u>repetitive</u> grasping w/RUE."  (AR 180)(emphasis added).  This opinion was entirely

12  consistent with ALJ Birge's conclusion that claimant could only "<u>occasionally</u> perform forceful

13  grasping with the right upper extremity."  (AR 24)(emphasis added).  See <u>Andrews v. Shalala</u>,

14  53 F.3d 1035, 1039-40 (9th Cir. 1995)(where evidence is susceptible to more than one rational

15  interpretation, the ALJ's conclusion must be upheld).

16  **4.      Vocational Expert Testimony Regarding Available Sedentary Jobs**

17       Claimant contends that the ALJ erred by relying exclusively on the Medical-Vocational

18  Guidelines at step five of the sequential analysis.  (Doc. 15, pp. 21-23).  According to claimant, the

19  ALJ should have consulted a vocational expert to determine the extent of any erosion of the available

20  job base due to certain nonexertional limitations found by ALJ Birge.  (Doc. 15, p. 21).  The Court

21  agrees.

22       The Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpt. P, App. 2 (also known as

23  "the Grids") facilitate administrative decision-making by "reduc[ing] four factors - residual

24  functional capacity, age, education, and work experience - to binary, 'yes/no' conclusions; the grids

25  then mandate a bright-line finding of disability or nondisability based upon the combination of these

26  four factors."  <u>Chavez v. Bowen</u>, 844 F.2d 691, 693 (9th Cir. 1988).  Beneficially, the Grids can

27  serve to "relieve the Secretary of the need to rely on vocational experts" in the course of the

28  disability determination.  <u>Heckler v. Campbell</u>, 461 U.S. 458, 461 (1983).

1    However, when the Grids do not adequately take into account a claimant's abilities and

2    limitations, they serve only as a framework, in which case resort to a vocational expert is still

3    required.  Thomas, 278 F.3d at 960 ("The Grids are used to determine whether substantial gainful

4    work exists for the claimant with respect to substantially uniform levels of impairment . . . . When

5    they do not adequately take into account claimant's abilities and limitations, the Grids are to be used

6    only as a framework, and a vocational expert must be consulted").

7    Here, ALJ Birge identified three nonexertional limitations:  (1) claimant can "only

8    occasionally crouch, stoop, squat, climb, or crawl," (2) claimant "is unable to push or pull with the

9    right lower extremity," and (3) claimant can "only occasionally perform forceful grasping with the

10   right upper extremity."  (AR 24).  Under rulings promulgated by the Commissioner, the first of these

11   limitations would not erode the sedentary occupational base so much that it would take the instant

12   case outside of the Grids or necessitate vocational expert testimony.  However, the second and third

13   nonexertional limitations could and would do so.

14   Pursuant to SSR 96-9p, a restriction on crouching, stooping, squatting, climbing and crawling

15   to no more than an "occasional" basis - the first nonexertional limitations listed by ALJ Birge - is not

16   relevant to sedentary work and therefore does not erode the occupational base for such work:

17       "Postural limitations or restrictions related to such activities as
         climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching,
18       or crawling would not usually erode the occupational base for a full
         range of unskilled sedentary work significantly because those activities
19       are not usually required in sedentary work . . .  restriction to occasional
         stooping should, by itself, only minimally erode the unskilled
20       occupational base of sedentary work.  Consultation with a vocational
         resource may be particularly useful for cases where the individual is
21       limited to less than occasional stooping."

22   SSR 96-9p, 1996 WL 374185, *7-8 (July 2, 1996)(emphasis added).  Given the lack of erosion, the

23   need to call a vocational expert does not arise.  Tackett v. Apfel, 180 F.3d 1094, 1102 (9th Cir. 1999)

24   ("'the fact that a non-exertional limitation is alleged does not automatically preclude application of

25   the grids.  The ALJ should first determine if a claimant's non-exertional limitations significantly

26   limit the range of work permitted by his exertional limitations'")(quoting Desrosiers, 846 F.2d at

27   577).

28   ///

16

The second nonexertional limitation noted by ALJ Birge, which involved pushing or pulling with the right lower extremity (AR 24), is more problematic.  As noted by the Commissioner, SSR 96-9 does state that pushing or pulling does not erode a sedentary occupational base:

> "Limitations or restrictions on the ability to push or pull will generally have little effect on the unskilled sedentary occupational base."

SSR 96-9p, 1996 WL 374185, *6 (July 2, 1996).  However, the above-quoted text is part of a section within the Social Security Ruling entitled "Lifting/carrying and pushing/pulling," and precedes another section entitled "Standing and walking," all of which indicates that the passage relates more to upper extremities than to the legs and feet.  Furthermore, in another Social Security Ruling cited by the Commissioner for different purposes, it is stated that the ability to use the legs and feet to operate pedals or treadles is *required* for certain jobs:

> "In jobs performed in a seated position which require the operation of pedals or treadles, a person must have the use of his or her legs and feet."

SSR 83-14, 1983 WL 31254, * 2.

Most serious is the third and final nonexertional limitation noted by ALJ Birge - a limitation to "occasional" forceful grasping.  The Commissioner, in her brief, attempts to create a distinction between fine finger manipulation of small objects (clearly relevant to *sedentary* work) and gross handling and grasping (which the Commissioner contends applies *exclusively* to unskilled *light* work).  (Doc.19, pp. 9-10).

In this regard, it is true that SSR 96-9p states that a manipulative limitation significantly erodes the sedentary job base:

> "Any significant manipulative limitation of an individual's ability to handle and work with <u>small</u> objects with both hands will result in a significant erosion of the unskilled sedentary occupational base."

SSR 96-9p, 1996 WL 374185, *8 (July 2, 1996)(emphasis added).

It is also true that another Social Security Ruling cited by the Commissioner, SSR 83-14, states that unskilled *light* work requires gross handling and grasping, but not fine fingering skills. SSR 83-14, 1983 WL 31254, *4 (1983) ("Unlike unskilled sedentary work, many unskilled light jobs do not entail fine use of the fingers.  Rather, they require gross use of the hands to grasp, hold, and

17

1   turn objections.  Any limitation on these functional abilities [in the context of light work] must be

2   considered very carefully to determine its impact on the size of the remaining occupational base of a

3   person who is otherwise found functionally capable of light work").

4          From these two rulings, i.e., fine fingering being important to sedentary work on the one

5   hand, and gross handling being important to light work on the other, the Commissioner infers that

6   gross handling is not also relevant to sedentary work.  (Doc. 19, pp. 9-10).  This inference, according

7   to the Commissioner, justifies the ALJ's election not to call a vocational expert.  (Id.)

8          The Commissioner's analysis notwithstanding, the Court notes that there several passages

9   within several Social Security Rulings commenting upon the importance of handling and grasping in

10  all classes of work, which would include sedentary work.  Thus, SSR 83-14 states:

11              "[A]t all exertional levels, a person must have certain use of the arms
                and head to grasp, hold, turn, raise, and lower objects.  Most sedentary
12              jobs require good use of the hands and fingers."

13  SSR 83-14, 1983 WL 31254, * 2.  A subsequent Social Security Ruling, pertaining to the evaluation

14  of exclusively nonexertional impairments, reiterates the same point:

15              "[H]andling (seizing, holding, grasping, turning or otherwise working
                primarily with the whole hand or hands) are activities required in
16              almost all jobs.  Significant limitations of reaching or handling,
                therefore, may eliminate a large number of occupations a person could
17              otherwise do.  Varying degrees of limitations would have different
                effects, and the assistance of a [vocational expert] may be needed to
18              determine the effects of the limitations."

19  SSR 85-15, 1985 WL 56857, *7.  In light of these rulings by the Commissioner, the limitation on

20  forceful grasping as found by ALJ Birge may limit claimant's functional capacity in ways not

21  contemplated by the grids.  In such circumstances, vocational testimony should be considered.

22  Tackett, 180 F.3d at 1102 (when claimant suffers from non-exertional limitations not contemplated

23  by the grids, the ALJ is required at step five to call upon a vocational expert).

24                                  **CONCLUSION**

25         The Court has the discretion to remand the case for additional evidence and finding or to

26  award benefits.  Smolen, 80 F.3d at 1292.  The Court may award benefits if the record is fully

27  developed and further administrative proceedings would serve no useful purpose.  Id.  Remand is

28  appropriate when additional administrative proceedings could remedy defects.  Rodriguez v. Bowen,

1    876 F.2d 759, 763 (9th Cir. 1989).  In this case, further development of the record is necessary for a

2    proper determination to be made.

3            Accordingly, it IS ORDERED that

4            1.      Claimant's social security complaint IS GRANTED; and

5            2.      The matter IS REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for

6    development of the record and further consideration, consistent with this decision, of claimant's

7    status as disabled.  Specifically, the Commissioner is directed to (1) reconsider the medical opinions

8    of treating neurologist Perminder Bhatia, M.D., and the propriety of the reasons identified for

9    discounting those opinions and (2) obtain vocational expert testimony with respect to whether, given

10   claimant's age, education, work experience, and residual functional capacity, claimant can perform

11   any other gainful and substantial work within the economy, 20 C.F.R.§§ 404.1520(g)(DIB),

12   416.920(g); and

13           3.      Judgment BE ENTERED for claimant Caesar Castillo and against Defendant Jo Anne

14   B. Barnhart.

15

16   IT IS SO ORDERED.

17   Dated:   **August 1, 2006**                                    **/s/ Theresa A. Goldner**
     **j6eb3d**                                            UNITED STATES MAGISTRATE JUDGE
18

19

20

21

22

23

24

25

26

27

28